1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DANIEL STEINOCHER,                    No.  2:12-cv-0467 JAM DB P

12              Plaintiff,

13        v.                               FINDINGS AND RECOMMENDATIONS

14   CHRISTOPHER SMITH, et al.,

15              Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights

18   action under 42 U.S.C. § 1983.  In his complaint, plaintiff alleges defendants were deliberately

19   indifferent to his serious medical needs in violation of the Eighth Amendment.  Plaintiff claims

20   that defendants failed to provide him with adequate medical care for his degenerative disc

21   disease, which causes him chronic neck pain. He also claims that the defendants failed to provide

22   him with adequate medical care for a knee injury he suffered.  Before the court is defendants'

23   motion for summary judgment.  For the reasons set forth below, the court recommends

24   defendants' motion be granted.

25                    **ALLEGATIONS IN THE COMPLAINT**

26        This case is proceeding on plaintiff's original complaint, filed here on February 23, 2012.

27   (ECF No. 1.)  Therein, plaintiff alleges that he suffers from (and has been diagnosed with) a

28   degenerative disc disease which causes him chronic neurological pain.  Plaintiff also alleges that

1

1    he suffered from an apparent tear of the anterior cruciate ligament of his right knee, which also

2    causes him pain.  In addition, plaintiff alleges that he repeatedly asked the named defendants for

3    appropriate and adequate medical care, including effective pain management, to no avail.

4    Specifically, according to plaintiff, the defendants either directly denied him medical care at his

5    medical appointments, denied him relief when he sought medical care through the inmate appeals

6    process, and/or provided him medical care inconsistent with outside treating neurologist Dr. Bai's

7    orders and recommendations with regard to the appropriate medical treatment.

8                                    **PROCEDURAL BACKGROUND**

9           On screening, a previously-assigned magistrate judge found plaintiff's complaint appeared

10   to state a cognizable claim for deliberate indifference to his serious medical needs under the

11   Eighth Amendment against defendants Smith, Heatley, Akintola, Fong, and Zamora.  (ECF No.

12   7.)  In February 2013, based on plaintiff's failure to keep the court apprised of his address, this

13   action was dismissed for failure to prosecute.  (ECF No. 19.)   Shortly after judgment was

14   entered, plaintiff moved to be relieved of the judgment.  The court granted plaintiff's motion and

15   re-opened the case.  (ECF No. 29.)

16          Defendants moved to dismiss the complaint for failure to state a claim.  (ECF No. 18.)  In

17   2015, that motion was denied.  (ECF Nos. 35, 37.)

18          On March 31, 2016, defendants filed the present motion for summary judgment.  (ECF

19   Nos. 51-54.)

20                           **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

21          Defendants move for summary judgment on the grounds that some defendants did not

22   provide any medical treatment to plaintiff and those that did provided regular, timely, and

23   adequate medical treatment.  Defendants also contend they are entitled to qualified immunity.

24   **I.      Legal Standards**

25   **A.   Summary Judgment Standards Under Rule 56**

26          Summary judgment is appropriate when the moving party "shows that there is no genuine

27   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

28   Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of

2

1    proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litigation, 627

2    F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The

3    moving party may accomplish this by "citing to particular parts of materials in the record,

4    including depositions, documents, electronically stored information, affidavits or declarations,

5    stipulations (including those made for purposes of the motion only), admissions, interrogatory

6    answers, or other materials" or by showing that such materials "do not establish the absence or

7    presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

8    support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

9         When the non-moving party bears the burden of proof at trial, "the moving party need

10   only prove that there is an absence of evidence to support the nonmoving party's case." Oracle

11   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.). See also Fed. R. Civ. P. 56(c)(1)(B).

12   Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

13   against a party who fails to make a showing sufficient to establish the existence of an element

14   essential to that party's case, and on which that party will bear the burden of proof at trial. See

15   Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the

16   nonmoving party's case necessarily renders all other facts immaterial." Id. In such a

17   circumstance, summary judgment should be granted, "so long as whatever is before the district

18   court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

19        If the moving party meets its initial responsibility, the burden then shifts to the opposing

20   party to establish that a genuine issue as to any material fact actually does exist. See Matsushita

21   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the

22   existence of this factual dispute, the opposing party typically may not rely upon the allegations or

23   denials of its pleadings but is required to tender evidence of specific facts in the form of

24   affidavits, and/or admissible discovery material, in support of its contention that the dispute

25   exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must

26   demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

27   suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

28   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

1   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

2   for the nonmoving party, see <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir.

3   1987).

4        In establishing the existence of a factual dispute, the opposing party need not establish a

5   material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be

6   shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

7   <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the

8   pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

9   <u>Matsushita</u>, 475 U.S. at 587 (citations omitted).

10       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

11  court draws "all reasonable inferences supported by the evidence in favor of the non-moving

12  party." <u>Walls v. Central Contra Costa Transit Auth.</u>, 653 F.3d 963, 966 (9th Cir. 2011).  It is the

13  opposing party's obligation to produce a factual predicate from which the inference may be

14  drawn. <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

15  <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

16  party "must do more than simply show that there is some metaphysical doubt as to the material

17  facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

18  nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation

19  omitted).

20      **B.  Other Applicable Legal Standards**

21         **1.  Civil Rights Act Pursuant to 42 U.S.C. § 1983**

22  The Civil Rights Act under which this action was filed provides as follows:

23          Every person who, under color of [state law] . . . subjects, or causes
        to be subjected, any citizen of the United States . . . to the

24          deprivation of any rights, privileges, or immunities secured by the
        Constitution . . . shall be liable to the party injured in an action at

25          law, suit in equity, or other proper proceeding for redress.

26  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

27  actions of the defendants and the deprivation alleged to have been suffered by the plaintiff.  <u>See</u>

28  <u>Monell v. Dept. of Social Servs.</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976).  "A

1   person 'subjects' another to the deprivation of a constitutional right, within the meaning of §1983,

2   if he does an affirmative act, participates in another's affirmative acts or omits to perform an act

3   which he is legally required to do that causes the deprivation of which complaint is made."

4   Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

5       Supervisory personnel are generally not liable under § 1983 for the actions of their employees

6   under a theory of respondeat superior and, therefore, when a named defendant holds a

7   supervisorial position, the causal link between him and the claimed constitutional violation must

8   be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v.

9   Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the

10  involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of

11  Regents, 673 F.2d 266, 268 (9th Cir. 1982).

12              **2.   Deliberate Indifference under the Eighth Amendment**

13      The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

14  Const. amend. VIII.  The unnecessary and wanton infliction of pain constitutes cruel and unusual

15  punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

16  Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

17  Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy

18  and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited

19  by the Cruel and Unusual Punishments Clause."  Whitley, 475 U.S. at 319.

20      What is needed to show unnecessary and wanton infliction of pain "varies according to

21  the nature of the alleged constitutional violation."  Hudson v. McMillian, 503 U.S. 1, 5 (1992)

22  (citing Whitley, 475 U.S. at 320). In order to prevail on a claim of cruel and unusual punishment,

23  however, a prisoner must allege and prove that objectively he suffered a sufficiently serious

24  deprivation and that subjectively prison officials acted with deliberate indifference in allowing or

25  causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

26      If a prisoner's Eighth Amendment claim arises in the context of medical care, the prisoner

27  must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference

28  to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has

two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. See Farmer, 511 U.S. at 834. Generally, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).

Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835.

Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S. at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th

1   Cir. 2002); <u>Berry v. Bunnell</u>, 39 F.3d 1056, 1057 (9th Cir. 1994); <u>McGuckin</u>, 974 F.2d at 1059;

2   <u>Wood v. Housewright</u>, 900 F.2d 1332, 1335 (9th Cir. 1990); <u>Hunt v. Dental Dep't</u>, 865 F.2d 198,

3   200 (9th Cir. 1989); <u>Shapley v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir.

4   1985).  In this regard, "[a] prisoner need not show his harm was substantial; however, such would

5   provide additional support for the inmate's claim that the defendant was deliberately indifferent to

6   his needs." <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006).

7        Finally, mere differences of opinion between a prisoner and prison medical staff or

8   between medical professionals as to the proper course of treatment for a medical condition do not

9   give rise to a § 1983 claim.  <u>See</u> <u>Toguchi</u>, 391 F.3d at 1058; <u>Jackson v. McIntosh</u>, 90 F.3d 330,

10   332 (9th Cir. 1996); <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989); <u>Franklin v. Oregon</u>, 662

11   F.2d 1337, 1344 (9th Cir. 1981).

12        **3.   Qualified Immunity**

13        Government officials enjoy qualified immunity from civil damages unless their conduct

14   violates clearly established statutory or constitutional rights.  <u>Jeffers v. Gomez</u>, 267 F.3d 895, 910

15   (9th Cir. 2001) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  When a court is

16   presented with a qualified immunity defense, the central questions for the court are: (1) whether

17   the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

18   defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

19   was "clearly established." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>receded from</u>, <u>Pearson v.</u>

20   <u>Callahan</u>, 555 U.S. 223 (2009) (the two factors set out in <u>Saucier</u> need not be considered in

21   sequence).  "Qualified immunity gives government officials breathing room to make reasonable

22   but mistaken judgments about open legal questions." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743

23   (2011).  The existence of triable issues of fact as to whether prison officials were deliberately

24   indifferent does not necessarily preclude qualified immunity.  <u>Estate of Ford v. Ramirez–Palmer</u>,

25   301 F.3d 1043, 1053 (9th Cir. 2002).

26   ////

27   ////

28   ////

## II.        Undisputed Material Facts[1]

Plaintiff is incarcerated at Mule Creek State Prison ("MCSP").  At times relevant to this lawsuit, defendant Akintola was a Physician Assistant, defendant Smith was the Chief Physician and Surgeon (CP&S), defendant Heatley was the Chief Medical Officer and Chief Medical Executive (CMO/CME), and defendant Fong was the Chief Executive Officer (CEO) at MCSP. Defendant Zamora was the Chief of CDCR's Inmate Correspondence and Appeal's Branch and was located at a different site.  (DSUF #2.)

Since early 2008, plaintiff had complained of headaches, and he was prescribed Ergotamine-Caffeine tablets (a combined medication used to treat and prevent migraine headaches) and Ibuprofen. He was subsequently prescribed Midrin (also known as Epidrin, used to treat tension and migraine headaches), Propranolol (used to treat high blood pressure but also prevents migraines), Naproxen (non-steroidal anti-inflammatory used to relieve pain, muscle aches, swelling, and joint stiffness), and Gabapentin (a seizure medication used to treat nerve pain) to address his headaches and complaints of pain. (DSUF #6.)

On May 14, 2008, defendant Akintola saw plaintiff for his continued complaint of headaches and concerns he had with his pain medications. Akintola diagnosed him with chronic headaches and prescribed him Propranolol and Motrin; he was already receiving Midrin and Ibuprofen. Akintola scheduled plaintiff for a two-month follow-up appointment and requested that plaintiff be referred to Dr. Feng Bai, a pain-management specialist, to evaluate his neck pain and determine whether epidural steroid injections (ESI) were medically indicated.  (DSUF #7.)

On June 13, 2008, Akintola saw plaintiff in a follow-up appointment for his chronic pain.  He was scheduled to see a neurologist on May 30, 2008, but according to Akintola's notes, he did not see the neurologist on May 30.  Akintola reviewed plaintiff's MRI from 2004 that showed he had a bulge at C6-C7 of the cervical spine.  Plaintiff complained of pain radiating

////

_____

[1] The court reiterates those portions of Defendants' Statement of Undisputed Facts ("DSUF") (ECF No. 51-1) which plaintiff admits are true in his "Admissions and Denials to Defendants' Statement of Undisputed Facts" ("Pl.'s Resp.") (ECF No. 62).

from the neck to the back of his head.  Akintola prescribed him Gabapentin pending the ESI evaluation with Dr. Bai.  He was still receiving Midrin and Ibuprofen.  (DSUF #8.)

On August 27, 2008, plaintiff met with neurologist Dr. Bai.  (DSUF #9.)  The Corrections Clinic Note, apparently prepared by, or at the behest of, Dr. Bai, from that visit states the following:

**CHIEF COMPLAINT**
Neck pain and headache.

**HISTORY OF PRESENT ILLNESS**
. . . . The patient reports he has felt neck pain for 4 years and also with headache.  He feels constant sharp and stabbing pain.  Sitting, standing and lying down increases symptoms.  Changing head position also increases symptoms.  He had an MRI and x-ray study. He takes Neurontin and Naprosyn for pain.  He was _____ of pain due to the pain not being controlled.  He denied bowel or bladder incontinence.  He denies footdrop.  He had tried Imitrex, Ibuprofen, Propranolol, Tylenol and _____.

. . .

**CURRENT PAIN MEDICATIONS**
1.  Neurontin 600 mg 3x a day.
2.  Naprosyn 500 mg at night.

**PHYSICAL EXAMINATION**
GENERAL:  The patient is an adult male, well-developed, well-nourished without acute distress.

. . .

**RADIOLOGICAL STUDY**
Cervical spine x-ray of 04/01/06 was reported as normal.

Brain MRI of 09/27/07 with normal findings.

Cervical spine MRI of 9/28/07 reviewed a C5-C6 and broad disk with posterior disk bulging with some mild foraminal narrowing. C6-C7 and right paracentral disk protrusion with minimal mass effect association on the right side of the cord.  There is right foraminal narrowing.

**IMPRESSION**
1.  Chronic neck pain with headaches.
2.  C5-C6 and C6-C7 disk degenerative disease with foraminal narrowing, right side worse.
3.  Myofascial pain syndrome.

**PLAN**
1.  Discussed with patient regarding his diagnosis and management

plan.   Informed him the results of the radiologic study.
Informed the patient the treatment options including
medication, self exercise and interventional pain procedure.
There is no surgical indication at this time.

2.  Bilateral _____ nerve block and trigger point injection.
Discussed with the patient the procedure, benefits and risks.  He
agreed to have the procedure done today.  A mixed solution of
15mg Kenalog and 5mL of 2% lidocaine _____ 10mL of
solution.  A _____ nerve block was used with 3 mL of mixed
solution on each side.  Four trigger point at bilateral cervical
paraspinal muscle and bilateral trapezius muscles were
identified and injection with 1 mL mixed solution per location.
The patient tolerated the procedure well without complication.

3.  Recommend physical therapy.

4.  May consider _____ muscle relaxer.

5.  May consider epidural steroid injection if above treatment does
not help.

(Ex. A to Mar. 31, 2016 Decl. of Diana Esquivel ("Esquivel Decl."), Pl.'s Med. Records ("MR")

at A11-A12 (ECF No. 51-8 at 12-13).) (Underscored blank sections in original.)

After his consult with Dr. Bai, plaintiff underwent physical therapy, and he continued to

receive Midrin, Gabapentin, and Naproxen for his pain from August 2008 to April 2009.  In

September 2008, he was prescribed Robaxin (Methocarbamol), a muscle relaxer.  Plaintiff was

also provided with over-the-counter medications such as Motrin and Tylenol.  (DSUF #10.)

On October 20, 2008, Akintola saw plaintiff for complaints of abdominal pain in addition

to his continued complaints of neck pain and headaches.  He expressed concerns that the

Gabapentin was causing his abdominal pain.  Akintola discontinued the Naproxen and lowered

the dosage of the Gabapentin for two weeks then discontinued it as well.  Akintola prescribed him

over-the-counter pain medications, such Motrin and Tylenol; he was still receiving Midrin.

Akintola scheduled him for a sixty-day follow-up appointment.  (DSUF #11; MR (ECF No. 51-8

at A17-A18; Ex. B to Esquivel Decl., Pl.'s Medication Reconciliation records ("RX") at B12

(ECF No. 51-10 at 13); Mar. 29, 2016 Decl. of O. Akintola ("Akintola Decl.") ¶ 8 (ECF No. 51-2

at 3).[2])

---

[2] With respect to these points, and a number of others, plaintiff does not state whether he admits
or denies them.  (See Pl.'s Resp. (ECF No. 62).)  His failure to do so renders these facts
undisputed.  See Curtis v. Costco Wholesale Corp., 807 F.3d 215, 218-19 (7th Cir. 2015) (citing
Ammons v. Aramark Unif. Servs., 368 F.3d 809, 818 (7th Cir. 2004)); Collins v. County of Kern,
390 F. Supp. 2d 964, 971-72 (E.D. Cal. 2005); Allen v. Hernandez, No. CV-05-0145-SRB (PC),
2009 WL 737045, at *3 (E.D. Cal. Mar. 19, 2009).  That said, the court has checked all facts cited

10

1    Akintola next saw plaintiff on January 9, 2009.  Plaintiff continued to complain of neck

2    pain and headaches.  He told Akintola he was not having abdominal pain and claimed to be

3    working out, but explained that exercise did not help his headaches.  Akintola prescribed him a

4    trial of Depakote (an anti-seizure medication used to prevent migraines), and started him on

5    Naproxen again since his abdominal pain had resolved.  (DSUF #12; Akintola Decl. (ECF No.

6    51-2) ¶ 9; MR (ECF No. 51-8) at A21; RX (ECF No. 51-10) at B14.)

7    In March 2009, plaintiff started physical therapy, and on April 14, 2009, Akintola

8    prescribed him (at Dr. Soltanian's direction) Tylenol with Codeine (also known as Tylenol #3

9    ("T-3")) for sixty days to address his neck pain.  He continued to receive Midrin and Naproxen.

10   (DSUF #13; Akintola Decl. (ECF No. 51-2) ¶ 10; MR (ECF No. 51-8) at A21-A24; RX (ECF No.

11   51-10) at B16-B17.)

12   In response to an inmate appeal plaintiff submitted concerning his head and neck pain, Dr.

13   Soltanian renewed the prescription for T-3 and also prescribed him Lyrica (Pregabalin), a

14   medication used to treat nerve and muscle pain, on July 20, 2009.  (DSUF #14; MR (ECF No. 51-

15   8) at A25-A27; RX (ECF No. 51-10) at B18; Ex. C to Esquivel Decl., Pl.'s Inmate Appeal

16   #MCSP-16-09-11699 (ECF No. 51-11).)

17   Over the course of the next six months, plaintiff received T-3 and Lyrica, with intermittent

18   prescriptions for Naproxen, Midrin, and over-the-counter pain medications.  According to

19   plaintiff, the Midrin was discontinued on August 10, 2009.  In addition, he was placed in MCSP's

20   Chronic Care Program and regularly treated and monitored by medical staff for his neck pain.

21   (DSUF #15; Pl.'s Resp. (ECF No. 62) at 17.)

22   On March 29, 2010, while jogging, plaintiff heard a pop in his right knee, requiring that

23   seek medical attention.  (DSUF #17.)   On April 14, 2010, medical staff treated plaintiff's knee

24   injury. He claimed that his pain level was two out of ten, and he had full range of motion of his

25   knee with a minor deviation in his gait. Because he was already prescribed T-3 and other pain

26

27   in this description of the undisputed material facts against the evidence cited by defendants and
     finds they are supported.  Where plaintiff has not admitted or denied a point, the court cites to the

28   evidence provided by defendants.

1    medications, no further medications were medically indicated for his knee pain.  By late April

2    2010, he was prescribed a knee brace and x-rays were ordered. The x-rays showed some

3    degenerative changes, but his right knee was otherwise stable and unchanged.  (DSUF #18.)

4         On May 24, 2010, plaintiff saw neurologist Dr. Fossan who evaluated his head and neck

5    pain.  Dr. Fossan found that plaintiff had full range of motion in his neck without tenderness; he

6    had no motor weakness; and his gait was normal.  He concluded that although plaintiff's 2007

7    MRI showed disc bulges at C5-C6 and C6-C7, there was no clear nerve root impingement or

8    evidence of muscle spasm. Dr. Fossan recommended a conservative and symptomatic course of

9    treatment, determined that plaintiff was not a surgical candidate, and cautioned that taking T-3 on

10   a regular basis may result in analgesic rebound headaches (headaches caused by regular, long-

11   term use of pain relievers and medication used to treat headaches).  (DSUF #19.)

12        In early June 2010, plaintiff submitted inmate appeal #MCSP-10-11346 complaining

13   about his knee pain and treatment.  A week later, he filed appeal #MCSP-10-11471 complaining

14   about the medical treatment he was receiving for his neck condition and pain and requesting ESI.

15   (DSUF #21; Pl.'s Resp. (ECF No. 62) at 21.)

16        In July 2010, Dr. Galloway examined plaintiff and responded to the two appeals he had

17   submitted. Dr. Galloway denied plaintiff's request for ESI because no neurologist had determined

18   that plaintiff's neck condition would benefit from ESI and his headaches appeared to be caused

19   by muscle tension.  As to plaintiff's knee condition, Dr. Galloway found that he was able to walk

20   and climb stairs without difficulty, and he had no swelling, effusion, or instability of the knee.

21   Dr. Galloway recommended an MRI of the knee.  (DSUF #22.)

22        Plaintiff had MRIs of his right knee performed on September 2 and October 28, 2010.

23   The studies showed arthritic changes of the knee and a tear of the anterior cruciate ligament

24   (ACL).  (DSUF #23.)

25        On September 29, 2010, plaintiff's appeal #MCSP-10-11471 was denied at the second

26   level of review.  Defendant Heatley was assigned to prepare the response.  He reviewed plaintiff's

27   medical records and determined that plaintiff was receiving appropriate treatment and pain

28   management for his neck condition such that ESI was not medically indicated. The CEO at the

1   time approved the second-level response.  (DSUF #24.)

2         Plaintiff complained of an inability to climb onto an upper bunk due to his knee pain, so

3   he was prescribed an accommodation for a bottom bunk in December 2010.  In December 2010,

4   his provider also referred him for an orthopedic consult with Dr. Lovett based on the findings in

5   the MRIs.  On January 27, 2011, plaintiff saw Dr. Lovett, who recommended that plaintiff

6   undergo surgery to repair the torn ACL (right knee arthroscopy).  The next day, medical staff

7   submitted the CDC 7243, which was approved three days later.  (DSUF #25.)  Plaintiff underwent

8   right knee surgery on April 13, 2011, and he received physical therapy following the surgery.  He

9   was also prescribed a knee sleeve to help in his recovery.  (DSUF #26.)

10        Plaintiff's T-3 prescription, which was due to expire in December 2010, was renewed for

11   an additional two months on December 3, 2010 and again for thirty days on February 11, March

12   2, April 5, and May 9, 2011.  And it was renewed again for three months on June 10, 2011.

13   (DSUF #27.)

14        Akintola treated plaintiff on May 9, 2011 for several unrelated conditions. Akintola

15   renewed his T-3 prescription by increasing his intake to three times a day for three weeks, then

16   twice a day for three weeks, and then discontinued the medication.  Akintola ordered plaintiff's

17   T-3 discontinued because he found the conditions for which he saw plaintiff on May 9 had

18   stabilized and narcotics were not medically necessary for those conditions.  (DSUF #28.)

19        Akintola treated plaintiff again ten days later on May 19, 2011, to monitor plaintiff's

20   condition after his surgery to repair his torn ACL.  Plaintiff was doing well, and he was wearing a

21   knee sleeve.  Plaintiff denied having moderate pain, so Akintola scheduled him for a follow-up

22   appointment with the orthopedist.  (DSUF #29.)

23        On June 2, 2011, plaintiff submitted inmate appeal #MCSP-11-11079, complaining that

24   Akintola failed to renew his Pregabalin prescription that was due to expire on June 9, 2011.

25   (DSUF #30.)

26        On June 10, 2011, Akintola saw plaintiff for complaint of neck pain.  Plaintiff still had a

27   prescription for T-3 (due to expire June 13).  Akintola diagnosed him as having chronic neck

28   pain.  (DSUF #31.)

13

1    On July 1, 2011, Akintola reviewed plaintiff's medication history and interviewed him in

2    connection with inmate appeal #MCSP-11-11079 for not renewing his Pregabalin on June 10.

3    Akintola provided the first-level response to the appeal, explaining the reasons for not renewing

4    his medication and the referral of plaintiff's case to the pain management committee.  (DSUF

5    #34.)

6    On August 10, 2011, Akintola referred plaintiff to the pain management committee.

7    (DSUF #32; Pl.'s Resp. (ECF No. 62) at 28; MR (ECF No. 51-8) at A116.)

8    On August 26, 2011, Heatley prepared and approved the second-level response to appeal

9    #MCSP-11-11079 denying plaintiff's request to renew his Pregabalin prescription.  Based on

10    Heatley's review of plaintiff's medical records, Heatley determined that plaintiff was receiving

11    pain medication that was sufficient to control his pain, and Akintola's decision not to renew his

12    Pregabalin prescription pending review from the pain management committee was appropriate.

13    (DSUF #36.)

14    On September 20, 2011, medical staff saw plaintiff based on his request to renew his

15    Naproxen prescription and complaints of headaches and neck pain.  He described his pain as four

16    out of ten, reported constant bilateral temporal pain, and requested an MRI.  The nurse noted that

17    plaintiff walked normally; he had full range of side-to-side motion without difficulty; and he was

18    sitting comfortably on the examination table.  (DSUF #39.)

19    On September 29, 2011, the pain management committee reviewed plaintiff's case.  The

20    committee determined that narcotics were not medically indicated based on his medical records

21    and staff observations of him. The committee decided to taper plaintiff off of T-3. Because

22    Naproxen proved successful in the past, the committee recommended he remain on that

23    medication. The committee also decided that plaintiff may benefit from a trial of Amitriptyline

24    (Elavil), an anti-depressant that also treats nerve pain.  (DSUF #40.)

25    Over the course of the next three months, plaintiff was tapered off of T-3 and prescribed

26    Naproxen and Elavil.  Medical staff treated him on several occasions during this period and

27    observed him walking, sitting, and standing without difficulty.  In late December 2011, his Elavil

28    prescription was discontinued due to a possible allergy.  (DSUF #41.)

14

On February 8, 2013, Akintola treated plaintiff for various symptoms unrelated to his neck and knee pain. During this visit, plaintiff requested a bottom bunk accommodation chrono because his knee pain made it difficult for him to climb up and down to the top bunk. Akintola noted that plaintiff was still taking Naproxen for his pain. Akintola granted his request and issued him a permanent accommodation chrono for a bottom bunk. This was the last time Akintola treated plaintiff. (DSUF #42.)

In late 2014, plaintiff was diagnosed with cancer which required extensive treatment for the greater part of 2015. He was prescribed T-3 and Morphine to address the pain caused by the malignant condition in addition to the Naproxen that he continued to receive for his neck and knee conditions. (DSUF #44.)

In March 2015, plaintiff complained that he experienced a hyperextension of his right knee. His knee condition was monitored over the next several months while he was still undergoing cancer treatment. In June 2015, x-rays were taken of his cervical neck and knee. The x-ray of his neck showed no change from the 2014 study, and the knee x-ray showed moderate to severe arthritis. He underwent physical therapy. (DSUF #45.)

By September 2015, plaintiff's providers referred him for an orthopedic consultation for possible total knee replacement due to the increased pain in the right knee. He was originally scheduled for an October 2015 consult, but the appointment was canceled due to a power outage. On November 20, 2015, plaintiff had a telemedicine (videoconference) consultation with an orthopedic surgeon who recommended total knee replacement. On December 4, 2015, plaintiff's provider submitted a CDC 7243 requesting approval for plaintiff to undergo total knee replacement; it was approved ten days later. (DSUF #46.)

On December 10, 2015, plaintiff received a steroid injection in his right knee to help alleviate the pain. He complained that the injection did not relieve much of the pain, and on January 22, 2016, he was prescribed Morphine for the pain. He was still receiving Naproxen. (DSUF #47.) As of March 31, 2016, plaintiff continued to receive Naproxen and Morphine for pain. (DSUF #48.)

////

On April 4, 2016, plaintiff had a total knee replacement at San Joaquin General Hospital. On April 8, 2016, the hospital released him to the California Health Care Facility in Stockton. Plaintiff remained there until he was transferred back to MCSP on May 25, 2016.  (Pl.'s Resp. (ECF No. 62) at 1.)

### III.   Analysis

#### A.  Eighth Amendment

To establish an Eighth Amendment violation, plaintiff must prove each defendant was deliberately indifferent to his serious medical needs.  Defendants do not contest the seriousness of plaintiff's neck and knee conditions or of his related pain.  (See ECF No. 53 at 6 n. 1.)  Therefore, the only question under the Eighth Amendment is whether each defendant was deliberately indifferent.

To the extent plaintiff disputes defendants' statement of certain facts, where those facts are material, they are discussed below.

#### 1.   Liability of Defendants Fong and Zamora

Plaintiff asserts defendants Fong and Zamora were deliberately indifferent to his pain based on their rejection of his inmate appeal #MCSP-16-11-11079 at the second and third levels of review.  Defendants contend Fong and Zamora had no knowledge of plaintiff's medical condition and related pain because they did not, in fact, review those appeals.

#### a.   Background – Appeal #MCSP-16-11-11079

On June 1, 2011, plaintiff submitted inmate appeal #MCSP-16-11-11079.  (Ex. F to Esquivel Decl. (ECF No. 51-14).)  Therein, plaintiff explained that in August 2008, Dr. Bai recommended a list of procedures to be tried for relief of chronic pain.  Plaintiff said he had tried all those procedures except ESI, which he requested but was denied by Dr. Fossan.  In June 2010, he was prescribed Pregabalin and T-3 because T-3 alone was not adequate and he was still experiencing pain.  He stated that the Pregabalin and T-3 combination was more effective than all the other medications he had tried at "lowering this dehabilitating pain."  On May 12, 2011, defendant Akintola "failed to renew Pregabalin" and on May 19, 2011 told plaintiff his prescription for T-3 (Tylenol with codeine) would expire on June 13, 2011 and would not be

1   renewed.  On May 30, 2011, plaintiff did not take his morning and afternoon medications and the

2   pain was "so dehabilitating, [he] could only lay on [his] bed with [his] earplugs in unable to move

3   without exacerbating excruciating pain further."  He asked that he be permitted to continue the

4   Pregabalin/T-3 combination.

5           Plaintiff's first level appeal was granted in part by defendant Akintola and Dr. Rudas on

6   July 1, 2011.  (ECF No. 51-14 at 2, 6.)  In his conclusion, Akintola stated:  "Your request for

7   pregabaln (sic) is denied pending your pain intake appointment and the outcome of physical

8   therapy. . .  You are currently prescribed Acetaminphen with Codeine 300mg, one tablet, three

9   times a day, Acetaminphen 325mg, one-two tablets three times a day and Naproxen 500mg, one

10  tablet twice a day for pain."

11          In his July 26, 2011 appeal of this first level response, plaintiff stated that from June 9,

12  2010 to June 9, 2011, he was receiving a combination of Pregabalin and codeine that "was

13  working for chronic head pain."  Plaintiff stated that his constant pain continued and that the

14  current T-3, Naproxen, aspirin combination was not effective.  (Id. at 3, 5.)  Defendant Fong's

15  name is typed below the signature on the August 26, 2011 letter denying this second level appeal.

16  (Id. at 9.)

17          On September 16, 2011, plaintiff appealed the second level response – the "Director's

18  Level Review."  (Id. at 3.)  He stated that he had alerted Drs. Heatley and Rudas, defendant Fong,

19  and defendant Akintola to the fact that he was "suffering constant, severe, head pain, back pain,

20  and knee pain for which [he was] receiving inadequate treatment in violation of the Eighth

21  Amendment."  Plaintiff concluded by stating that he would sue for money damages.

22          On January 26, 2012, plaintiff's third level appeal was denied.  (Id. at 12.)  Defendant

23  Zamora's name is typed below the signature on the letter denying the third level appeal.  The

24  letter described treatment that had taken place since plaintiff filed his appeal in September 2011.

25  The letter noted that plaintiff had seen his primary care physician ("PCP") on December 1, 2011

26  and January 12, 2012, and the PCP "did not reference a medical indication for pregabalin."

27  ////

28  ////

17

**b.   Analysis of Liability of Defendant Fong**

In Fong's declaration, he states that in 2011, he was the Chief Executive Officer at MCSP. (Mar. 16, 2016 Decl. of I. Fong ("Fong Decl.") (ECF No. 51-3) ¶ 2.)  Fong explains that all second level inmate appeals at MCSP were forwarded to his office.  He would then assign a medical professional to review the appeal, investigate, review the inmate's medical records, and draft a response for his signature.  If he was out of the office, either the Chief Medical Officer or the Chief Medical Executive would review and sign the response.  Fong states that he does not recall plaintiff's appeal and that it is Dr. Heatley's, not his own, signature on the denial of plaintiff's appeal # MCSP-16-11-11079.  Dr. Heatley was the Chief Medical Executive at that time.  (Id. ¶¶ 3-6.)

A review of the denial of plaintiff's second level appeal shows the signature above the name "Lawrence C. Fong, M.P.H." does appear to be "Heatley MD."  (ECF No. 51-14 at 9.)  In addition, on the appeal form, it is Heatley's signature that appears twice for the denial of the second level appeal.  (Id. at 3.)  Fong's signature does not appear.  Plaintiff has not made any showing that defendant Fong had any personal knowledge of his medical condition or pain.  Accordingly, the court finds defendants have shown the absence of a genuine issue of material fact and summary judgment is appropriate with respect to defendant Fong.

**c.   Analysis of Liability of Defendant Zamora**

Defendant Zamora's declaration tells a similar story.  In 2011, Zamora was the Chief of the Inmate Correspondence and Appeals Branch ("ICAB").  (Mar. 29, 2016 Decl. of L. Zamora ("Zamora Decl.") (ECF No. 51-6) ¶ 2.)  Third level inmate health care appeals were processed by ICAB staff.  When ICAB received an inmate health care appeal, medically trained and licensed clinicians reviewed the submitted information along with the inmate's health records and prepared a proposed response.  Defendant Zamora would then review the information and proposed response.  If the proposed response was complete, defendant Zamora would sign it.  If Zamora was out of the office, an ICAB designee would review and sign the response.  (Id. ¶¶ 3-8.)

Zamora stated that s/he has no recollection of plaintiff's health care appeal and that the

1    signature on the denial of the third level appeal is not Zamora's.  Zamora stated that the signature

2    appears to be that of Zamora's designee R. Robinson.  (Id. ¶ 9.)

3         While the signature on the third level response is not clear on the copy provided to the

4    court, it does not appear to be the signature of "Zamora."  (ECF No. 51-14 at 12.)  Plaintiff has

5    not made any showing that defendant Zamora had personal knowledge of his medical condition

6    or pain.  Accordingly, the court finds defendants have shown the absence of a genuine issue of

7    material fact and summary judgment is appropriate with respect to defendant Zamora.[3]

8                    **2.   Liability of Defendant Heatley**

9         Plaintiff contends defendant Heatley was the first doctor to treat his right knee injury and

10   that he also denied two of plaintiff's appeals.

11                     **a.   Background**

12                     **i.      Knee Injury**

13        According to plaintiff, after injuring his knee on March 29, 2010, he made three requests

14   for a medical appointment before he was seen.  (Pl.'s Resp. (ECF No. 62) at 2-3.)  On April 14,

15   2010, plaintiff was seen by Nurse McAllister.  (Id. at 3; MR (ECF No. 51-8) at A42.)  According

16   to plaintiff, Nurse McAllister telephoned Dr. Heatley to describe plaintiff's problem and ask for

17   treatment orders.  Plaintiff's only basis for identifying the doctor on the phone as Dr. Heatley is

18   an "Exhibit 2" which is entitled "Response/Visit Summary Form."  According to plaintiff, under

19   the heading "Visit Summary" it states that he was "seen on 4/14/10 by McAllister/consult Dr.

20   Heatley."  (Pl.'s Resp. (ECF No. 62) at 3.)  The copy of this document provided by plaintiff is so

21   poor that the court is unable to determine if plaintiff's description of the document is correct.

22        With their reply, defendants provide a clearer copy of what appears to be the same

23

24   _____

     [3] To the extent plaintiff is alleging defendants Fong and Zamora are liable as supervisors,
25   supervisory personnel are generally not liable under § 1983 for the actions of their employees
     under a theory of respondeat superior.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979);
26   Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  For a defendant to be held liable as a
     supervisor under § 1983, plaintiff must show either that the supervisor was personally involved in
27   the constitutional deprivation or a sufficient causal connection between the supervisor's wrongful
     conduct and the constitutional violation.  See Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011).
28   As explained above, plaintiff has failed to make either showing.

                                        19

1    document.  (Ex. I to Reply (ECF No. 65).)  Under the heading "Visit Summary" the document

2    provides the information described by plaintiff.  However, the doctor's name is not entirely

3    legible.  Defendants allege the name is "Dr. Hawkins."  (See Reply (ECF No. 65) at 2.)

4    According to plaintiff's medical records, a Dr. Hawkins saw plaintiff on April 21, 2010 for his

5    knee problems.  (MR (ECF No. 51-8) at A43.)  In his declaration, Heatley states that he "never

6    treated or provided direct medical care to [plaintiff]."  (Mar. 29, 2016 Decl. of S. Heatley

7    ("Heatley Decl.") (ECF No. 51-4) ¶ 4.)  Defendants argue that plaintiff presents no other evidence

8    to show how he knew that Heatley was the doctor McAllister was speaking with.  The court

9    agrees that plaintiff has provided an insufficient basis to create an issue of fact that Dr. Heatley

10    was the doctor McAllister spoke with on the phone.

11        Moreover, plaintiff has not shown that the treatment he was provided on April 14, 2010

12    was medically unacceptable.  He complains generally about delays in the treatment of his knee

13    problem.  Vague claims of "pain and suffering" are insufficient at the summary judgment stage to

14    demonstrate a triable issue of material fact.  Quiroz v. California Dep't of Corr. & Rehab., No.

15    1:06-CV-01426-OWW, 2010 WL 3260132, at *10 (E.D. Cal. Aug. 18, 2010), findings and recos.

16    adopted, No. 1:06-CV-01426, 2010 WL 3733913 (E.D. Cal. Sept. 17, 2010).

17               **ii.**      **Denial of Second Level Appeals**

18        Defendants admit that Dr. Heatley signed the denial of two of plaintiff's second level

19    appeals.  As described above, Heatley denied plaintiff's second level appeal #MCSP-16-11-11079

20    and second level appeal #MCSP-16-10-11471.  That appeal, made one year prior to appeal

21    #MCSP-16-11-11079, is described here.

22        Plaintiff submitted appeal #MCSP-16-10-11471 on June 10, 2010.  (Ex. E to Esquivel

23    Decl. (ECF No. 51-13).)  The focus of this appeal was plaintiff's neck and head pain.  Therein,

24    plaintiff described his visit with Dr. Bai.  He stated that he had exhausted steps 1 through 4 of the

25    plan set out by Dr. Bai, which is described above.  He asked for step 5, ESI.  He explained that he

26    had seen a neurologist on May 25, 2010 at Jackson Medical who told him ESI were not indicated

27

28

1   for degenerative disk disease.  He felt the neurologist's statement was a "lie" and "unethical.[4]"

2   Plaintiff complained that his pain was increasing and was unbearable.  He asked to be seen by

3   "Neurologist Specialist Henry only" and to be given ESI.

4        Plaintiff's appeal was denied at the first level by R. Galloway, a physician, who

5   interviewed plaintiff and then found that plaintiff's "long standing degenerative disk disease is

6   unlikely to benefit much if at all from the ESI procedure.  Moreover, what you described to me

7   today sounds much more like headache (muscle tension type).  The ESI is not appropriate for

8   them at all."  (Id. at 10.)

9        Plaintiff's second level appeal of #MCSP-16-10-11471 was denied in September 2010 by

10  Heatley, identified as the Reviewer, and Dr. Heffner, who signed the denial letter in which he

11  stated that none of the physicians who had seen plaintiff in May and June 2010 felt ESI was

12  appropriate.  (Id. at 3, 11-12.)   The third level appeal was denied by N. Warren on February 23,

13  2011 for essentially the same reasons.  (Id. at 13-15.)

14       In his declaration, defendant Heatley describes his "customary practice" in reviewing an

15  inmate's second level health appeal:

16          was to review the inmate's medical records, investigate the
    complaint by speaking with the inmate's primary care provider or
17          other involved staff and, in certain circumstances, with the inmate.
    I then drafted the second-level response for the CEO's review and
18          approval. If the CEO was not available to review the second-level
    response, I signed and approved the response as acting CEO.
19

20  (Heatley Decl. (ECF No. 51-4) ¶ 3.)

21            **b.   Analysis of Liability of Defendant Heatley**

22      Generally, denying a prisoner's administrative appeal does not cause or contribute to the

23  underlying violation.  See George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007); Hernandez v.

24  Cate, 918 F. Supp. 2d 987, 1018 (C.D. Cal. 2013).  The review assessment of a correctional

25  medical official may constitute deliberate indifference only if the official was aware that the

26

---

27  [4] Plaintiff included with his appeal a copy of a page from spineuniverse.com that lists
    degenerative disk problems as one of the conditions for which ESI "are useful."  (ECF No. 51-13
28  at 7.)

1     underlying challenged medical decision caused plaintiff "further significant injury or the

2     unnecessary and wanton infliction of pain," and the official purposefully failed to pursue an

3     appropriate medical remedy.  Farmer v. Brennan, 511 U.S. 825, 842 (1994); see also Jett v.

4     Penner, 439 F.3d 1091, 1098 (9th Cir. 2006) (prison officials, particularly those in administrative

5     positions, may be "liable for deliberate indifference when they knowingly fail to respond to an

6     inmate's requests for help").  This rule is especially true where the reviewer is medically trained.

7     See, e.g., Thomas v. Nangalama, No. 2:10-cv-1295 JAM EFB P, 2013 WL 1281792, *7 (E.D.

8     Cal. Mar. 26, 2013), findings and recos. adopted, 2013 WL 1800344 (E.D. Cal. Apr. 29, 2013);

9     Pogue v. Igbinosa, No. 1:07-cv-1577 GMS, 2012 WL 603230 (E.D. Cal. Feb. 23, 2012)

10     (medically-trained individuals who are made aware of serious medical needs through reviewing a

11     prisoner's grievance may be liable for failure to treat those needs).

12                    **i.**         **Liability for Denial of Appeal #MCSP-16-10-11471**

13        Defendant Heatley is a medical doctor and the parties appear to agree that Heatley

14     reviewed plaintiff's medical records and his appeal and therefore was aware of plaintiff's neck

15     and head conditions and complaints of pain.  The question, then, is whether there is a genuine

16     issue of material fact about whether Heatley was deliberately indifferent to plaintiff's complaints.

17        In his appeal #MCSP-16-10-11471, plaintiff made two requests – to be seen by a specific

18     neurologist, a Dr. Henry, and to be given ESI.  Plaintiff has provided no material support for his

19     assertion that ESI were medically necessary.  Plaintiff relies largely on the report of Dr. Bai.

20     However, Dr. Bai stated only that doctors "may consider" ESI if other treatments were not

21     effective.  (MR (ECF No. 51-8) at A12.)  Several other doctors, including neurologist Dr. Fossan,

22     considered plaintiff's medical history and reports of pain and rejected the use of ESI.

23        Dr. Fossan examined plaintiff on May 24, 2010, shortly before he submitted appeal

24     #MCSP-16-10-11471.  (MR (ECF No. 51-8) A47-A48.)  Dr. Fossan's recommendations did not

25     include ESI.  Plaintiff stated in his appeal that Dr. Fossan told him ESI were not indicated for

26     degenerative disk disease.  (ECF No. 51-13.)  Plaintiff takes issue with Dr. Fossan's finding that

27     plaintiff had a full range of neck motion without tenderness.  (Oct. 6, 2015 Depo. of Daniel

28     Steinocher ("Pl.'s Depo."), lodged herein on Mar. 31, 2016 (see ECF No. 52) at 91.)

1       Plaintiff was seen on June 4, 2010 by either a nurse or defendant Akintola.  (MR (ECF

2  No. 51-8) at A49.)  At that time, Akintola continued plaintiff's prescriptions for Pregabalin and

3  T-3.  (RX (ECF No. 51-10) at B23.)  Dr. Galloway, who interviewed plaintiff in response to his

4  appeal, also found ESI inappropriate for plaintiff's pain.  (ECF No. 51-13 at 10.)

5       Plaintiff has failed to show a genuine issue of material fact that the denial of ESI

6  amounted to deliberate indifference on the part of Dr. Heatley.  Dr. Heatley had a right to rely

7  upon the judgment of examining physicians and specialists that ESI were not appropriate to

8  address plaintiff's pain.  See Watkins v. Singh, No. 2:13-CV-0416 KJM CKD, 2015 WL 136015,

9  at *3 (E.D. Cal. Jan. 9, 2015), aff'd sub nom. Watkins v. Bick, No. 15-15817, 2016 WL 4151400

10  (9th Cir. Aug. 5, 2016) ("It is generally not deliberate indifference to defer to a specialist.");

11  Coats v. Kimura, No. 2:09-cv-1830 KJM KJN P, 2013 WL 76288, at *20 (E.D. Cal. Jan. 4, 2013)

12  (appeal reviewer entitled to rely on treating doctors' expertise), findings and recos. adopted, 2013

13  WL 1325792 (Mar. 30, 2013); Butler v. Jong Yeoung Moon, No. 1:09–cv–2074 MJS P, 2011 WL

14  4591072, at *5 (E.D. Cal. Sept. 30, 2011).

15       Moreover, plaintiff admitted in his deposition that Dr. Bai did not recommend ESI.

16  Rather, he stated that Dr. Bai told him that "at some point, . . . ESIs might be considered if the

17  other procedures didn't work."  (Pl.'s Depo. at 70.)  Even if Dr. Bai had recommended ESI, a

18  difference of opinion between medical professionals regarding plaintiff's treatment is not enough

19  to establish deliberate indifference.  See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989);

20  Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).  Further, to the extent plaintiff contends

21  the failure to refer him to the specialist of his choice amounted to deliberate indifference, plaintiff

22  does not have a right to choose his doctors, or, for that matter, his pain medication.  See Potts v.

23  Stanislaus Co. Jail Med. Dept., No. 1:15-cv-1814 SAB (PC), 2016 WL 2593892, at *3 (E.D. Cal.

24  May 5, 2016); Alba v. M.C.C.C. Facility Med. and Corr. Staff, No. 13-0231 HG/KSC, 2013 WL

25  2637788, at *5 (D. Ha. June 12, 2013) (plaintiff not entitled to "the physician of his choice, or a

26  specific 'specialist'").

27       Finally, the court questions plaintiff's assertion that he suffered damage as a result of

28  Heatley's denial of his second level appeal #MCSP-16-10-11471.  In his appeal filed a year later,

1   #MCSP-16-11-11079, plaintiff stated that he had been taking the combination of Pregabalin and

2   T-3 for a year, starting on June 9, 2010.  In that appeal, plaintiff explained that discontinuing

3   Pregabalin would be detrimental because "[t]his combination was working for chronic head

4   pain."  (Ex. F to Esquivel Decl.  (ECF No. 51-14 at 3).)  In his declaration, plaintiff states that

5   "pregabilin relieved my nerve pain in my neck."  (July 21, 2016 Decl. of Daniel Steinocher

6   ("Pl.'s Decl.") ¶ 25 (ECF No. 62 at 39).)  Therefore, by plaintiff's own account, he was receiving

7   adequate treatment for his head pain between June 9, 2010 and June 9, 2011.  Because plaintiff's

8   appeal #MCSP-16-10-11471 only addressed his head and neck pain, plaintiff fails to show a

9   material issue of fact that he suffered any damage as a result of Dr. Heatley's denial of his appeal

10   in September 2010.

11             **ii.       Liability for Denial of Appeal #MCSP-16-11-11079**

12        In appeal #MCSP-16-11-11079 submitted on June 1, 2011, plaintiff complained about the

13   discontinuation of Pregabalin.  (ECF No. 51-14.)  Like appeal #MCSP-16-10-11471, this appeal

14   addressed plaintiff's complaints of head/neck pain only.  Plaintiff's first level of review was

15   partly granted and partly denied by Akintola.  Akintola noted that plaintiff had requested a

16   referral for a "pain intake evaluation" at his June 10, 2011 appointment.  That request was

17   granted.  Akintola continued, "Your request for pregabaln (sic) is denied pending your pain intake

18   appointment and the outcome of physical therapy, which you are in the process of receiving. . . ."

19   Akintola then listed the medications plaintiff was at that time prescribed:  T-3, Acetaminophen,

20   and Naproxen.  (Id. at 6.)

21        As described above, it was Dr. Heatley who reviewed, and denied, plaintiff's second level

22   appeal on August 26, 2011.  Heatley stated that on June 10, 2011, plaintiff was seen by medical

23   staff and "Akintola prescribed you the medication Salsalate and T-3, but he did not determine you

24   required a prescription for Pregabalin because you were functioning well on your current

25   treatment plan."  (Id. at 8.)  Plaintiff's medical records show a PCP "Progress Note" dated June

26   10, 2011 and signed by Akintola.  (MR (ECF No. 51-8) at A110-A111.)  The court is unable to

27   decipher them.  According to Dr. Heatley, in those notes, Akintola wrote that plaintiff's "pain

28   level was zero when he was on T-3."  They also show that Akintola referred plaintiff to the pain

24

1    management committee for guidance on the course of treatment.  (Heatley Decl. (ECF No. 51-4)

2    ¶ 15.)  In his declaration, Heatley further states that he felt that "[r]eassessment of his need for

3    Pregabalin was appropriate to ensure that [plaintiff] did not develop at tolerance to the medication

4    and that such medication was still medically indicated for his condition."  (Id. ¶ 16.)

5        Plaintiff disputes that he told Akintola the T-3 relieved his head/neck pain.  Plaintiff states

6    that he told Akintola on June 10, 2011 that within twenty-four hours of the discontinuation of the

7    Pregabalin, he "began experiencing severe pain in my neck."  (Pl.'s Decl. ¶ 40 (ECF No. 62 at

8    43).)  Plaintiff's medical records show that on June 23, 2011, he wrote a Health Care Services

9    Request Form in  which he stated that the combination of Salsalate and T-3 "is still allowing

10   headache and making my stomach hurt."  (MR (ECF NO. 51-8)  at A113.)  The following day,

11   Akintola signed medication record in which he replaced Salsalate with a prescription for

12   Naproxen.  (RX (ECF No. 51-10) at B36.)

13       In plaintiff's appeal of the first level response, submitted on July 26, 2011, plaintiff stated

14   that the current combination of T-3, Naproxen, and aspirin was not effective.  (ECF No. 51-14 at

15   5.)  Heatley denied that second level appeal on August 26, 2011.  It appears that plaintiff

16   remained on the T-3, Naproxen, aspirin regimen at that time and until his case was considered by

17   the pain committee at the end of September 2011.

18       In reviewing plaintiff's second level appeal, Heatley knew Akintola had replaced the

19   Pregabalin with Salsalate and then, as soon as plaintiff informed him that that combination was

20   not effective, Akintola replaced the Salsalate with Naproxen.  During this time, plaintiff remained

21   on the T-3.  Heatley also knew plaintiff had been referred for review by the pain management

22   committee.

23       Plaintiff fails to show the medical care he was receiving was medically unacceptable or

24   that Heatley's denial of his appeal was made with conscious disregard of an excessive risk to

25   plaintiff's health.  Akintola was trying various medications for plaintiff's pain and had a reasoned

26   basis for discontinuing the Pregabalin.  Plaintiff has not shown that concerns that he would

27   develop a tolerance to Pregabalin and that he needed a reduction in his pain medications to

28   determine whether the physical therapy on his knee was effective were medically unacceptable

1   reasons for discontinuing the Pregabalin.  This court finds plaintiff has failed to show a disputed

2   issue of material fact regarding Heatley's response to his second level appeal #MCSP-16-11-

3   11079.

4   **3.   Liability of Defendant Smith**

5         Defendant Smith was the Chief Physician and Surgeon at MCSP and was a member of

6   MCSP's pain management committee.  (Compl. ¶ 5; Mar. 29, 2016 Decl. of C. Smith ("Smith

7   Decl.") (ECF No. 51-5) ¶¶ 1, 2.)  In his complaint, plaintiff's only specific allegation regarding

8   defendant Smith is in a reference to Heatley's denial of his second level appeal #MCSP-16-11-

9   11079.  Plaintiff notes that in Heatley's description of the prison's review of the

10   recommendations of outside consultants, Heatley stated that once that recommendation is made, it

11   is "reviewed by the attending physicians and the Chief Physician and Surgeon [Defendant

12   Christopher Smith was/is the MCSP Chief Physician and Surgeon.] at MCSP, and a

13   determination is made as to whether or not all recommendations are medically necessary."

14   (Compl. ¶ 29.)  This notation appears to be a reference to Dr. Bai's suggestion that ESI might be

15   considered.  Plaintiff has failed to show defendant Smith in fact reviewed Dr. Bai's suggestion or,

16   for the reasons discussed above with respect to defendant Heatley, that even if Dr. Smith did, the

17   failure to provide ESI was medically unacceptable.

18         Plaintiff admits that Smith never treated or provided him direct medical care.  (Pl.'s Resp.

19   (ECF No. 62) at 5.)  Further, while defendants state that Smith approved some non-formulary

20   medications for plaintiff, plaintiff denies that fact.  He states that Smith "never approved any,

21   non-formulary or otherwise, medication for plaintiff."  (Id.)  In his deposition, plaintiff testified

22   that he felt Smith must have had some involvement in the grievance process because he was in

23   charge.  (Pl.'s Depo. at 48.)  Plaintiff felt that the lower level medical staff "had to at some point"

24   make their "supervisors aware of the situation."  (Id. at 124.)  Plaintiff also testified that he had

25   heard Smith was on the pain management committee and that committee had rejected the

26   continuation of Pregabalin and T-3.  (Id. at 48-49.)  However, plaintiff stated that he was not sure

27   Smith was on the committee when it considered his case.  (Id.)  In his deposition, plaintiff

28   explained that the pain committee did not interview him personally but reviewed paperwork that

26

1     he submitted.  (Id. at 54-55.)

2          In his declaration, Smith confirms that he was on the pain management committee.

3     (Smith Decl. (ECF No. 51-5) ¶ 2.)  He states that he does not recall if he was part of the

4     committee that reviewed plaintiff's case in September 2011. (Id. ¶ 19.)

5          Plaintiff fails to show Smith had any personal knowledge of his complaints of pain.

6     Accordingly, plaintiff cannot establish Smith was subjectively deliberately indifferent to his pain.

7     Summary judgment is appropriate on plaintiff's claims against defendant Smith.

8                    **4.   Liability of Defendant Akintola**

9          Defendant Akintola was a physician's assistant at MCSP who treated plaintiff "at various

10    times from 2008 until May 2013" for a number of conditions, including plaintiff's neck and right

11    knee conditions and related pain.  (Compl. ¶ 7;  Akintola Decl. (ECF No. 51-2) ¶¶ 1-3.)

12                 **a.   Akintola's Decisions re Plaintiff's Head/Neck Care**

13         In his complaint, plaintiff states that he filed health care appeal # MCSP-16-11-11079 to

14    protest "defendant O. Akintola's discontinuance of pregabalin for his neck pain; failure to treat

15    his right knee injury." (Compl. ¶ 27.)  He describes Akintola's denial of that appeal at the first

16    level. (Id. ¶ 28.)  As stated above, however, in appeal #MCSP-16-11-11079 plaintiff complained

17    only of the discontinuance of Pregabalin which he says he took only for head/neck pain.  In his

18    complaint, plaintiff raises no other issues regarding his care by Akintola.  However, in his

19    response to the DSUF and in his deposition, plaintiff also references health care appeal #MCSP-

20    16-09-11699 when discussing his complaints against Akintola.

21                   **i.      Health Care Appeal #MCSP-16-09-11699**

22         The copy of #MCSP-16-09-11699 provided by defendants shows that plaintiff submitted

23    it on June 18, 2009.  (ECF No. 51-11.)  Therein, plaintiff explained that he had an MRI in 2007

24    and saw Dr. Bai in 2008 for his head and neck pain.  Dr. Bai gave him pain blocker shots and he

25    was prescribed Gabapentin.  He was also sent to physical therapy in February and March 2009,

26    but it did not help and the physical therapist told him he should be referred to a pain specialist.

27    Plaintiff stated that his medications had run out on the 13th and 18th of June 2009 and he was in

28    "unbearable pain."  He asked to see a pain specialist and to "be put on a more reliable pain

1   management system so that undue suffering does not have to be experienced on my behalf again."

2          Plaintiff did not explain in this grievance how Akintola was involved in these decisions.

3   A review of plaintiff's medical records shows that after plaintiff saw Dr. Bai in August 2008,

4   Akintola prescribed various medications for him including Gabapentin, Naproxen, Robaxin,

5   Midrin, Motrin, Depakote, and T-3.  The last medication record signed by Akintola before

6   plaintiff submitted his June 2009 grievance is dated April 14, 2009.  (RX (ECF No. 51-10) at

7   B17.)

8          The first level response to plaintiff's appeal #MCSP-16-09-11699 was signed by Dr.

9   Soltanian on July 20, 2009.  Dr. Soltanian stated that he would put plaintiff on T-3 and

10  Pregabalin.  (Id. at 4.)  Plaintiff's medication records show that Dr. Soltanian prescribed those

11  medications for plaintiff on that date.  (RX (ECF No. 51-10) at B18.)  According to plaintiff, the

12  Pregabalin/T-3 combination worked well for his head/neck pain.  Therefore, he received a

13  satisfactory resolution of appeal #MCSP-16-09-11699.  It appears that Akintola was attempting to

14  address plaintiff's pain by trying numerous medications.  Plaintiff makes no specific allegations

15  about what Akintola did not do or should have done.  The court finds plaintiff has failed to show

16  Akintola was deliberately indifferent during this time period.

17                    **ii.      Complaints of Pain in Late 2009**

18         According to plaintiff, his pain became severe again in December 2009, when the

19  prescriptions for Pregabalin and Naproxin were stopped "for no apparent reason."  (Pl.'s Resp.

20  (ECF No. 62) at 19.)  Plaintiff does not explain who was responsible for the discontinuation of

21  these prescriptions.  And, it does not appear those medications were, in fact, discontinued at that

22  time.  Plaintiff's medication records show that on December 7, 2009, one prescription for

23  Pregabalin was replaced with a different prescription for the same drug by Dr. Soltanian.  In

24  addition, plaintiff continued to be prescribed T-3.  (RX (ECF No. 51-10) at B21.)  The next

25  medication record in plaintiff's file shows that on March 16, 2010, plaintiff was continuing to

26  receive both Pregabalin and T-3.  (RX (ECF No. 51-10) at B22.)  This court finds plaintiff has

27  failed to show that Akintola was responsible for any discontinuation of his medications in late

28  2009.

### iii.     Health Care Appeal #MCSP-16-11-11079

In his declaration, Akintola states that he discontinued plaintiff's prescription for Pregabalin in June 2011 because plaintiff had been taking it for a year and Akintola was concerned that plaintiff would "develop a tolerance to the medication."  Therefore, Akintola referred plaintiff to the pain management committee to assess whether Pregabalin was still medically indicated.  (Akintola Decl. (ECF No. 51-2) ¶ 15.)  Akintola also felt that discontinuing the Pregabalin was necessary so that he could determine whether plaintiff's physical therapy was beneficial.  (Id.)

Plaintiff disputes that Akintola referred him to the pain management committee on June 10, 2011.  He claims the records show that he was not referred until August 10, 2011.  Plaintiff's medical records show that he saw Akintola on June 10, 2011.  Akintola's notes, while difficult to decipher, do mention "pain intake" (MR (ECF No. 51-8) at A110) and the following "physician's order" says "Schedule pain intake" (MR (ECF No. 51-8) at A111).  In notes dated July 1, 2011, when Akintola interviewed plaintiff based on his appeal, Akintola wrote that "a pain intake was already requested."  (MR (ECF No. 51-8) at A115.)  The next document in plaintiff's medical record is a note dated August 10, 2011 by Akintola that appears to be a referral to the pain management committee.  (MR (ECF No. 51-8) at A116.)  A note in different handwriting states "copy to pain committee."

Plaintiff's medical records show that his case was reviewed by the pain management committee on September 29, 2011.  (MR (ECF No. 51-8) at A123)  At that time, the committee determined that opioids were no longer indicated and instructed that plaintiff should be tapered off T-3, receive a trial of Amitriptyline, and should be careful with NSAIDs.

In their reply brief, defendants state that there is no evidence that Akintola was aware, prior to August 10, that there had been a delay in having plaintiff's case reviewed by the pain management committee.  The court agrees.  It appears that Akintola had concerns about plaintiff's long-term use of Pregabalin so he referred plaintiff to the pain management committee for a review of the medical necessity of that drug.  Nothing indicates Akintola had any awareness, much less responsibility, for the apparent delay in the June 2011 referral to pain management.

1    Plaintiff fails to show that discontinuing the Pregabalin was medically unacceptable or

2    done in conscious disregard of an excessive risk to his health.  As described above, Akintola had

3    reasons for the discontinuation and plaintiff fails to present any evidence that those reasons were

4    not legitimate or demonstrate a deliberate indifference to his pain.  Further, Akintola replaced the

5    Pregabalin prescription with Salsalate and, when plaintiff complained about the Salsalate,

6    replaced it with Naproxen a day later.  It appears Akintola was trying to address plaintiff's

7    complaints of pain.  Finally, plaintiff fails to show that Akintola was at fault for the delay in

8    having his case considered by the pain management committee.

9        For these reasons, this court finds no triable issues of material fact regarding whether

10   Akintola was deliberately indifferent to plaintiff's head/neck pain when he discontinued

11   plaintiff's prescription for Pregabalin in June 2011.

12                    **b.   Akintola's Decisions re Plaintiff's Knee Care**

13       On June 3, 2010, plaintiff submitted inmate appeal #MCSP-10-11346.  (ECF No. 51-12.)

14   Therein, he explained that he injured his knee on March 29, 2010 and the next day put in an

15   emergency medical slip.  On April 23, 2010, he had an x-ray and on May 22, 2010, he "received

16   CDCR 6939 stating no follow-up necessary."  He complained of pain in his right knee.  Noting

17   that the x-ray showed tendon and inner knee damage, he requested an MRI and to be seen by a

18   knee specialist.  In a further explanation, plaintiff stated that Akintola told him during a

19   medication renewal appointment on June 4, 2010, that he would not get further medical attention

20   for his knee and would "just have to stop exercising."

21       In his response to the DSUF, plaintiff contends he did not see Akintola on June 4, 2010

22   and saw only a nurse.  (Pl.'s Resp. (ECF No. 62) at 20.)  However, on the following page,

23   plaintiff states that it is not clear whether he saw just the nurse or also saw Akintola.  (Id. at 21.)

24   Plaintiff's medical records show that Akintola signed the PCP Progress Note for that visit and that

25   he refilled plaintiff's prescription, including those for Pregabalin and T-3, at that time. (MR (ECF

26   No. 51-8) at A49-A50; RX (ECF No. 51-10) at B23.)

27       On July 14, 2010, Dr. Galloway partly granted plaintiff's first level appeal.  (Id. at 7.)  He

28   stated that he would submit a referral for an MRI and that after the results were reviewed,

1   plaintiff "may be referred to an Orthopedist."  Plaintiff did not further appeal that decision.

2          In his deposition, plaintiff stated that he had seen Akintola at least once regarding his knee

3   and had asked for crutches.  (Pl.'s Depo. at 121.)  He recalled that it took a long time to get them.

4   He did not recall asking Akintola for pain medication for his knee.  However, he testified that

5   every time he saw a doctor, he told the doctor he was in a lot of pain.  (Id. at 123.)  Plaintiff made

6   clear that he felt the 13 months he had to wait to get his first knee surgery was too long and that

7   he was in pain during that entire time.  (Id. at 125-26.)  Plaintiff had the first knee surgery on

8   April 13, 2011.  (Id. at 120.)

9          It is true that plaintiff submitted numerous requests for medical appointments regarding

10  his knee pain before and after his April 2011 surgery.  (See MR (ECF No. 51-8) at A40 (4/2/10

11  request); A41 (4/9/10 request); A46 (5/5/10 request); A54 (4/13/10 request); A57 (9/7/10

12  request); A60 (11/30/10 request); A70 (2/10/11 request); A72 (2/23/11 request); A74 (3/4/11

13  request); A124(10/21/11 request); A146 (10/25/12 request); A150 (1/3/13 request); A161

14  (10/11/13 request); A180 (3/25/15 request); A185 (5/20/15 request); A203 (10/26/15 request);

15  A205 (11/6/15 request); A213 (11/25/15 request); A220 (12/21/15 request); A222 (1/5/16

16  request); A225 (1/9/16 request); A228 (1/27/16 request).  However, plaintiff does not show that

17  Akintola was responsible for addressing those requests or that he made any medically

18  unacceptable decisions regarding plaintiff's knee care.  Plaintiff's vague allegations that it took a

19  while to get crutches and that he must have asked Akintola for pain medications for his knee or

20  insufficient to show Akintola was, in fact, deliberately indifferent to his pain.

21                              **CONCLUSION**

22          For the reasons set forth above, the court finds defendants have met their burden of

23  showing an absence of genuine issues of material fact regarding whether they were deliberately

24  indifferent in treating plaintiff's neck/head pain, knee injury, and knee pain.  Plaintiff has failed to

25  present evidence showing there are triable issues in this regard.  Because the court finds

26  defendants' motion for summary judgment should be granted on the Eighth Amendment issues,

27  the court need not address defendants' arguments that they are entitled to qualified immunity or

28  that plaintiff's claim for injunctive relief is barred.

1        Accordingly, IT IS HEREBY RECOMMENDED that defendants' March 31, 2016 Motion

2   for Summary Judgment (ECF No. 51) be granted.

3        These findings and recommendations will be submitted to the United States District Judge

4   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

5   after being served with these findings and recommendations, any party may file written

6   objections with the court and serve a copy on all parties. The document should be captioned

7   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

8   objections shall be filed and served within fourteen days after service of the objections.  The

9   parties are advised that failure to file objections within the specified time may result in waiver of

10  the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11  Dated:  January 30, 2017

14  DEBORAH BARNES
    UNITED STATES MAGISTRATE JUDGE

18  DLB:9
19  DLB1/prisoner-civil rights/stei0467.msj fr

32